# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DEBRA A. ZICKEFOOSE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 10-CV-166-PJC |
| | ) |
| MICHAEL J. ASTRUE, Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## ORDER AND OPINION

Claimant, Debra A. Zickefoose, ("Zickefoose"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Zickefoose's applications for disability benefits under the Social Security Act. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Zickefoose appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Zickefoose was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

On the date of the administrative hearing on March 23, 2009, Zickefoose was 51 years of age. (R. 229). She had a high school education. *Id*. Zickefoose testified her last employment was as a warehouse cigarette packer in 2007. (R. 230-31). Her employment ended when her back "froze up" and she was subsequently terminated for going to a doctor appointment. (R. 231-32).

Zickefoose was able to care for herself, as well provide care for elderly mother and brother, who were both ill. (R. 232). She performed their household chores, did their laundry, and ran errands. *Id.* She stated she could read and write. (R. 230, 232). She could make change but found it difficult to do so at times. (R. 230). She was able to read, but found it difficult due to an inability to concentrate. (R. 232, 234, 238, 240). Her lack of ability to concentrate, focus, and remember made it difficult to watch a movie. (R. 235).

Zickefoose testified she had a poor track record of maintaining jobs and was often terminated. (R. 233-34). She believed that the reasons she was terminated were poor work attendance, trouble with coworkers, and an inability to function at work. *Id.* Often her ability to function was interrupted because she was easily distracted or experienced racing thoughts. (R. 233-34). She equated her inability to work to a change in her ability to clean her mother's efficiency size apartment. (R. 237). She stated she had previously cleaned the apartment in an hour, but when she became distracted by racing thoughts, it increased to a day long process. (R. 236-37). She described her racing thoughts as like a "tug of war" inside her head for up to three hours. *Id.*

Zickefoose experienced problems with stress and anxiety, and she had panic attacks. (R. 234, 236). Panic attacks caused Zickefoose to feel shaky, withdrawn, and unable to think. (R. 240-41). During panic attacks, Zickefoose was unable to focus, talk, or be productive. (R. 238-39). In a typical month, she might stay in her house on five days, leaving only to take her trash out. (R. 239-40). Zickefoose said that she frequently experienced nightmares that affected her ability to maintain continuous sleep. (R. 238-39). She slept approximately three to five hours nightly and experienced a lack of energy. (R. 239).

Zickefoose stated her problems started at age seventeen due to being reared in a dysfunctional

family setting. (R. 238, 241-42). At times she would "blank out" to avoid her family situation, and while she could sometimes perform her daily activities while she was "blanked out," she would not remember doing so. *Id*. She felt that her problems had progressively increased with time. (R. 238-39).

Zickefoose testified she had been a patient of Dr. Edgar Cleaver, a psychologist, for eleven years for pharmaceutical management. (R. 235). Medications helped Zickefoose's symptoms of anxiety and helped control her racing thoughts so that she could better focus. (R. 235-36)

Agency consultant Dr. John T. Atwood, a clinical psychologist, conducted a mental status examination of Zickefoose on July 5, 2006. (R. 165-67). Dr. Atwood said that Zickefoose exhibited sober facial expressions and poor eye contact, and she spoke with a flat, sad voice. (R. 165-66). During the examination, Zickefoose bit her nails and held her knees as she rocked back and forth. (R. 165). Dr. Atwood noted Zickefoose appeared angry and distracted, and she exhibited fragmented thoughts*. Id.* During testing, Zickefoose had difficulty with math questions. *Id*. Zickefoose reported she "slept horribly" and "frequently woke with nightmares." *Id.* She reported she had vivid nightmares of stabbing someone. *Id.* She said that her sleep was frequently interrupted by people she saw at the end of her bed who made loud noises in her head. (R. 166). She reported the people tried to take over her mind while she tried to sleep. *Id.* She heard the noises in her head since she was a child. *Id*. Zickefoose could not go out of her house due to her fear of the actions and statements of people. *Id.* She reported two suicide attempts and recent suicide ideation. *Id*.

In Dr. Atwood's conclusion, he opined that Zickefoose used isolation, avoidance, and projection as her defense mechanisms. (R. 166). He believed that her personality at times was

3

similar to a schizoaffective style. *Id.* Dr. Atwood's diagnoses on Axis I[1] were post traumatic stress disorder ("PTSD"), attention-deficit/hyperactivity disorder, panic disorder with agoraphobia, and a note to rule out possible schizoaffective disorder. *Id.* On Axis II, his diagnosis was probable borderline or mild mental retardation, mixed personality disorder not otherwise specified, with dependent and avoidant features. *Id.* He did not believe that Zickefoose could manage benefit payments. (R. 167).

Zickefoose was examined by William L. Cooper, Ph.D, an agency consultant, on September 21, 2006. (R. 168-71). Dr. Cooper explained that his evaluation was to administer the Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III") rather than to conduct a comprehensive examination. (R. 168). Zickefoose described complaints of panic attacks, depression, and a hip condition. *Id.* She reported that she was able to care for herself, shop, make change, read, and socialize. *Id.* Zickefoose reported that she saw a psychiatrist and had inpatient mental health treatment at age 25. *Id.* In the interview, Dr. Cooper said that Zickefoose displayed normal speech and was able to express her thoughts adequately. *Id.* He noted that she exhibited a depressed mood, and at times seemed irritable, moody, and slightly agitated. (R. 168-69). Zickefoose was restless and seemed to be physically uncomfortable. (R. 169).

During testing, Zickefoose at times appeared confused and preoccupied, and she had difficulty concentrating. *Id.* Zickefoose worked slowly and had difficulty comprehending the test directions. *Id.* Dr. Cooper noted Zickefoose became slightly "oppositional" and did not appear to give full effort during testing. *Id.* He concluded that "the present scores do not appear to be a good

---

[1]The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000).

4

estimate of her current abilities." *Id*. He said that it was not clear that she was intentionally malingering. *Id*. He said that Zickefoose's "oppositionality," as well as her anxiety, depression, and other emotional factors interfered with her performance. *Id*. Zickefoose's verbal IQ was 64, performance IQ was 62, and her full scale IQ was 60. *Id*. While Zickefoose scored in the range of extremely low ability, Dr. Cooper estimated that she had at least borderline intellectual potential. (R. 169). He said there were no obvious signs of psychosis. *Id*. He found that Zickefoose could understand simple questions and follow simple directions. (R. 169-70). He further found that Zickefoose had difficulty relating to others and was likely to have limited ability to tolerate stress. (R. 170). Dr. Cooper stated that Zickefoose did not appear able to manage her own funds. *Id*

Agency nonexamining consultant Laura Lockner, Ph.D., completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment on September 22, 2006. (R. 173- 90). For Listing 12.05, Dr. Lochner noted that Zickefoose had mild mental retardation disorder. (R. 177). Dr. Lockner noted Zickefoose's IQ scores in the 60s were an underestimate of Zickefoose's true functioning due to irritability, depression, confusion, and anxiety. *Id.* For Listing 12.06, Dr. Lockner assessed Zickefoose with PTSD and panic disorder with agoraphobia. (R. 178). For the "Paragraph B Criteria,"[2] Dr. Lochner found that Zickefoose had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation.

---

[2]There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

(R. 183). In the "Consultant's Notes" portion of the form, Dr. Lockner briefly summarized the mental status examinations of Dr. Cooper and Dr. Atwood. (R. 185). She also briefly described Zickefoose's activities of daily living. *Id*.

In her mental RFC assessment, Dr. Lockner found that Zickefoose was markedly limited in her ability to understand, remember, and carry out detailed instructions. (R. 187). She additionally found Zickefoose markedly limited in her ability to interact appropriately with the general public. (R. 188). She found no other significant limitations. *Id*. Dr. Lockner stated that Zickefoose could understand and perform simple and some complex tasks. (R. 189). She determined Zickefoose could interact appropriately with others on a superficial level, but not with the general public. *Id.* She stated that Zickefoose could adjust to a work situation. *Id.*

Zickefoose was seen for a physical examination by agency consultant Angelo Dalessandro, D.O., on May 23, 2006. (R. 159-64). Zickefoose's chief complaint was pain, stating that she experienced pains in her legs, shoulders, arms, hips, and knees. (R. 159). *Id.* She additionally reported she had stiffness in her ankles, knees, hands, neck, and back. *Id.* Zickefoose reported she had shortness of breath on exertion, indigestion, heartburn, hiatal hernia, chronic fatigue, arthritis, all body paresthesias[3], occipital headaches, tinnitus[4], vertiginous episodes, nervousness, and depression. (R. 159-60). She further reported she had difficulty sleeping. (R. 160). Dr. Dalessandro said that Zickefoose presented with a flat affect and appeared depressed. *Id*. On examination, he found bilateral paravertebral tenderness with straight leg raising positive to 60

---

[3]Parathesia is a "[s]ensation of numbness, prickling, or tingling or tingling; heightened sensitivity." Taber's Cyclopedic Medical Dictionary 1438 (17th ed. 1993).

[4] Tinnitus is defined in as a"[r]inging or tingling sound in the ear." Taber's Cyclopedic Medical Dictionary 2000 (17th ed. 1993).

6

degrees and pain elicited with movement of the cervical area. *Id*. Dr. Dalessandro's first impression was the need to rule out fibromyalgia, his second was hypothyroidism, and his third was hiatal hernia by history. (R. 161).

On September 29, 2006 agency nonexamining consultant Thurma Fiegel, M.D. completed a Physical Residual Functional Capacity Assessment. (R. 192-99). For exertional limitations, Dr. Fiegel found that Zickefoose could perform medium work. (R. 193). In the space for narrative explanation, Dr. Fiegel referred to Zickefoose's complaints of pain, but stated that she had full use and range of motion except in the lumbar area. *Id*. She also stated that Zickefoose had a normal gait, and no nerve root compression. *Id*. She stated that the agency had been unable to obtain any medical evidence of record. *Id*. For postural limitations, Dr. Fiegel found that Zickefoose could only occasionally stoop, but could do all other activities frequently. (R. 194). Dr. Fiegel found no other limitations. (R. 195-99).

Dr. Fiegel's assessment was apparently considered unacceptable because it did not note the date last insured of December 31, 2006. (R. 200). A new Physical Residual Functional Capacity Assessment was completed by agency nonexamining consultant Luther Woodcock, M.D. on April 17, 2007. (R. 202-09). Dr. Woodcock also found that Zickefoose could perform medium work. (R. 203). For narrative explanation, Dr. Woodcock reviewed Zickefoose's complaints of back and joint pain, and noted that there was not much treating physician evidence in the file. *Id*. He summarized the findings of Dr. Dalessandro. (R. 203-04). Dr. Woodcock stated that his exertional assessment was supported by Zickefoose's history of joint pain, her reported activities of daily living, and the findings of Dr. Dalessandro, and that pain would not further affect his assessment. (R. 204). Dr. Woodcock limited Zickefoose to occasional stooping, and he found no other limitations. (R.

204-09).

**Procedural History**

Zickefoose filed applications on March 15, 2006 seeking disability insurance benefits and supplemental security income benefits under Titles II and XVI, 42 U.S.C. §§ 401 *et seq*. (R. 71-73, 214-16). Ratliff alleged onset of disability as October 1, 2004. (R. 71). Both of Zickefoose's applications were denied in their entirety initially and on reconsideration. (R. 47-49, 50-57, 217-23). A hearing before ALJ Lantz McClain was held on March 23, 2009 in Tulsa, Oklahoma. (R. 224-47). At the commencement of the hearing, Zickefoose amended her onset date to October 31, 2007. (R. 227-28, 230). By decision dated June 18, 2009, the ALJ found that Zickefoose was not disabled at any time through the date of the decision. (R. 14-22). On February 2, 2010, the Appeals Council denied review of the ALJ's findings. (R. 4-7). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

**Social Security Law and Standard Of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[5] *See also Williams*

---

[5]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his

8

*v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the Agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

---

ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

## Decision of the Administrative Law Judge

The ALJ found that Zickefoose's date last insured was June 30, 2007. (R. 16). At Step One, the ALJ found that Zickefoose had not engaged in any substantial gainful activity since her amended onset date of October 31, 2007. *Id*. At Step Two, the ALJ found that Zickefoose had severe impairments of degenerative disc disease, borderline intellectual functioning, and anxiety. *Id.* At Step Three, the ALJ found that Zickefoose's impairments did not meet a Listing. (R. 17-18). The ALJ determined that Zickefoose had the RFC to perform medium work, with the exception of occasional stooping. (R. 18). The ALJ further limited Zickefoose to simple and repetitive tasks, with only incidental contact with the public. *Id.* At Step Four, the ALJ found that Zickefoose could return to her previous relevant work as a warehouse packer. (R. 21). Therefore, the ALJ found that Zickefoose was not disabled from her amended onset date of October 31, 2007, through the date of the decision. *Id*.

## Review

Zickefoose makes several arguments in asserting that the ALJ committed reversible error. Because the Court agrees with Zickefoose's first argument that the ALJ did not adequately set forth the mental requirements of her past relevant work at Step Four, her other arguments are not addressed.

Zickefoose's first argument is that the ALJ failed to make a proper inquiry regarding the demands of her past relevant work and failed to follow the required steps explained in *Winfrey v. Chater*, 92 F.3d 1017, 1023, 1025 (10th Cir. 1996). In *Winfrey*, the Tenth Circuit outlined three phases of a Step Four finding. First, the ALJ has to make specific RFC findings, both physical and mental, and relate those findings to the evidence. *Id*. at 1023-24. Second, "the ALJ must

make findings regarding the physical and mental demands of the claimant's past relevant work." *Id*. at 1024. The Tenth Circuit noted that special care must be taken in cases with mental impairments. *Id*. At phase three, the ALJ makes findings about the claimant's ability to meet the demands of her past relevant work. *Id*. at 1024-25.

Here the ALJ discussed the medical evidence at length, both in relationship to his Step Two and Step Three findings, especially regarding Zickefoose's mental limitations, and in relationship to his RFC determination. (R. 16-21). He reviewed the consultative examining reports of both Dr. Atwood and Dr. Cooper, and he reviewed Zickefoose's own testimony and her activity reports that are in the administrative transcript. *Id*. He also cited to the six different nonexamining agency consultants, all of whom completed RFC assessments that supported the ALJ's determination. (R. 20). The undersigned finds that the ALJ's decision is in compliance with the first phase of the Step Four finding as the Tenth Circuit outlined that phase in *Winfrey*.

Unfortunately the ALJ's decision did not comply with the requirement of the second phase, that the ALJ make findings regarding the physical and mental requirements of the claimant's past work. Here, the ALJ glossed over this requirement and omitted any discussion of what the mental requirements of the work were:

> [Zickefoose] has past relevant work as a warehouse [packer]. The [VE] testified that [her] past work was unskilled and classified as medium work in exertion. In comparing the claimant's [RFC] with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed.

(R. 21).

The ALJ's Step Four conclusion was made by the VE in his testimony, which was a one sentence answer that Zickefoose "should be able to do the packing job that she had previously

done" with no discussion of what the mental demands of that job were. (R. 243-44). This is exactly the situation that the Tenth Circuit found unacceptable in *Winfrey*:

> When, as here, the ALJ makes findings only about the claimant's limitations, and the remainder of the step four assessment takes place in the VE's head, we are left with nothing to review.

*Winfrey*, 92 F.3d at 1025.

In addition to not having any testimony from the VE regarding what the mental demands of a warehouse packer position were, the ALJ did not obtain a Dictionary of Occupational Titles ("DOT") number from the VE. (R. 243-44). The Tenth Circuit has affirmed when the ALJ's decision recited the DOT number for the claimant's previous work and the ALJ said that he had compared the RFC to the requirements of that work as cited in the DOT description. *See Parise v. Astrue*, 2010 WL 4846097 (10th Cir. 2010) (unpublished). Additionally, the ALJ did not make a Step Five finding in the interests of judicial economy, which may have made the Step Four issue harmless error. *See Martinez v. Astrue*, 316 Fed. Appx. 819, 824 (10th Cir. 2009) (unpublished) (improper Step Four findings did not require reversal when Step Five findings were proper). The Court is sympathetic to the Commissioner's concern, as stated in his brief, that *Winfrey* was not intended by the Tenth Circuit "to needlessly constrain ALJs by setting up numerous procedural hurdles that block the ultimate goal of determining disability." *Westbrook v. Massanari*, 26 Fed. Appx. 897, 903 (10th Cir. 2002) (unpublished). Here, however, the ALJ simply did not develop the record regarding mental demands of Zickefoose's past work, he did not obtain a DOT number from the VE, and he did not make an alternative Step Five finding. Any of these efforts by the ALJ may have saved his decision from reversal.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

Because the error of the ALJ related to the *Winfrey* requirements at Step Four requires reversal, the undersigned does not address the other contentions raised by Zickefoose. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Zickefoose.

**Conclusion**

Based on the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Zickefoose for further proceedings consistent with this Order.

Dated this 15th day of April, 2011.

_____
Paul J. Cleary
United States Magistrate Judge